Thank you. Your Honors, I'm Mark Nurheim, and I'm an attorney with the Law Offices of Art Klein, representing Mr. Mohamed Fofana, a citizen of Sierra Leone. With the Court's permission, I'd like to reserve three minutes for rebuttal. Thank you. Because you are familiar with the briefs, I will limit my review of the facts, the context of our arguments, unless, of course, you have specific questions. To qualify for asylum, Mr. Fofana has established that he is unable or unwilling to return to Sierra Leone because of persecution or a well-founded fear of persecution on account of at least one of the five grounds listed in the statute, including race, religion, nationality, membership in a particular social group, or his political opinion. An asylum applicant's testimony must be accepted as true in the absence of an explicit adverse credibility finding. The fact finder in this case, the immigration judge, must articulate specific cogent reasons for disbelief that are substantial, and the reasons must bear a legitimate nexus to the finding. Generalized statements that do not identify specific examples of evasiveness or contradiction are not sufficient. Minor inconsistencies that do not go to the heart of the asylum claims are insufficient to support an adverse credibility finding under the Ninth Circuit law. In the present case, the immigration judge made an adverse credibility determination premised upon, one, the immigration judge's perception that Mr. Fofana often gave nonresponsive or inconsistent answers to questions in his testimony. Two, that according to the immigration judge, Mr. Fofana's claim of imputed political opinion was totally undermined by a statement that the rebels in Sierra Leone looted and burned his family and killed his parents for the rebels' own personal enrichment. And three, that Mr. Fofana's asylum application indicated that neither he nor his family had belonged to or been associated with any group or organization. We responded in our briefs to each of those findings of the immigration judge as follows. First, we argued that Mr. Fofana was responsive to the questions asked of him, that he was hampered only at times by the interpreter's problems in translating. And if you look at the transcript, the immigration judge never once noted any unusual or lengthy delays in Mr. Fofana's answers. In fact, at times, Mr. Fofana was too responsive and the interpreter could not keep up. Elsewhere, the immigration judge had asked Mr. Fofana to stop talking while the interpreter was talking. I don't want to interrupt that, but I just have one question for you. I think there were some kind of hyper-technical grounds that the immigration judge advanced on credibility. But if we put those aside and say that we assume credibility, the immigration judge said that there was an alternate ground for the finding, and that was that if I were to accept the testimony, he hadn't demonstrated that his problems were on account of his family politics. And so that seems to me that even if you have credibility, you have to get over that hurdle. Your Honor, I think that what we have in the case is the on-account-of factors are met by the fact that his parents, as he testified, his father was active in his testimony in support of President Caba's organization and his government. He was known to be supportive of that, and he was active in rallies and meetings. And this is his father I'm talking about, and that his father was also apparently in the diamond business or a diamond merchant. I think that what the immigration judge focused on is kind of precisely that money, basically saying that the immigration judge found that in his view, the reason there was the attack is they wanted to, quote, cease the father's perceived wealth. How do we weigh that in terms of the finding? Because I think, Your Honor, in the briefs and in his testimony, he pointed, there was evidence in there that the rebel organization's groups, when they did looting, they were looking for sources to buy arms, and that they were trying to gain money either by taking over the diamond business or some parts of the gold business or the mining industries and attacking people and households to find ways to gather arms, to pay for arms and weapons. And there, I can't recall exactly off the top of my head, but I think there were at least two or three sections in the record that talked about that. One was from, I believe, an independent journalist, and there may have been something also from the Department of State. Are you saying, Counsel, in this record that the IJ could not legitimately make that finding, that he did? You may have an alternative finding and an alternative reading of the evidence. The question is, did the IJ have sufficient evidence in the record to make that finding? Or is the record totally devoid of any evidence that would support the IJ's finding? Those are the extremes within which I think you should answer that last question. Well, I think that we answer that by saying that the issue of the credibility finding goes to the credibility of Mr. Fofana being able to make that linkage in his testimony and what he explained at the, in his evidence. And he also has stated that when he was eventually taken captive and held captive by the rebels, that they tried to force him to join and that he had told them that he didn't want to join them because they had killed his father, because he didn't agree with their objectives. And I think that that is some of the linkage in there. And that, in our position, becomes somewhat convoluted with the issue of the credibility finding, because that credibility finding is running throughout the judge's analysis. That's how I think we answer that question. Well, there's another way to look at it, and that is there's kind of two statements. Take his statement as true, that they might have come because of the father's political position. And then he also says, but I recognize that there's this whole kind of economic pillage going on in the country. So even if you take both of those statements as true, which he made, don't they both kind of at a minimum cancel each other out and he fails to meet his burden on the unaccounted for? Your Honor, I think that the Ninth Circuit recognizes mixed motive. Yes. And to the extent that he has, that what he's identified, at least if there's some of those issues in there that are cogent that he's argued and he's presented to the immigration judge, he meets the mixed motive criteria that the Ninth Circuit recognizes. It doesn't mean that all of the basis for abuse that his family experienced or that he experienced have to be limited to the five enumerated elements. But at least one of them has to ring true. Mr. Knee here, suppose we were to say that he should be treated as credible. When he was captured and beaten by the refugee gang, whoever it was, he said that he told them he wouldn't join them because he didn't agree with their political beliefs or something, rather, and that they beat him because of that. Was that his testimony? I think, in part, it was a little bit mixed. He said that that was one of the reasons he didn't agree with what their objectives were. He didn't think they were moving right for the country. Why would they be? Because, in part, because he refused to join. And that was part of his basis for resisting joining. And he talks about that in there. And apparently, he was beaten on several occasions. I don't know how bad, for sure. But he did discuss that in there. And he said that he gave them the reasons that had several elements to it. He said that he didn't agree with their objectives. He didn't agree with what they did to his family. And he was very adamant about not joining them. And it wasn't until the ECOMOG forces came through that he was able to get out. And ECOMOG is the How do you say that the government, then, is responsible for that when they've been, apparently, fighting this guerrilla band for years? Yeah. So they have been attempting, but they've been unable to control it, is that? Yes. Yes, Your Honor. They've been unable to control the RUF, and I think it's the AFRC, for years. And that was discussed, also, in the briefing in there, I think, extensively. We talked about the different sources from both the Department of State and independent news agencies that were following up with that. I know- You want to reserve the rest of your time for rebuttal? We've treaded into your time, obviously, with questions. We'll give you a little bit extra time. Thank you very much, Your Honors. Thank you. Good morning. May it please the Court, I'm Joan Smiley, here from the Department of Justice for the Attorney General. Welcome back this week. Thank you. A narrow, substantial evidence standard of review applies to adverse credibility findings, as this Court has reiterated. Deference is owed to an immigration judge's credibility determination, which has also been consistently adhered to. And one reason for that is that the immigration judge has the unique opportunity to observe a witness, to evaluate his testimony. And the Court has held that to reverse this adverse credibility determination, a petitioner must demonstrate that no reasonable fact finder could have disbelieved the testimony. Secondly, as the Court has pointed out, even if the credibility finding is not endorsed by this panel, the immigration judge made an alternate finding, which was that the motive that Mr. Fofana testified to as to the rebels' motivation to loot the houses was for their personal enrichment. He also told the asylum officer this when he was interviewed in connection with his asylum application. Therefore, it was reasonable for the judge to conclude that the rebels were motivated by their desire to loot, personally enrich themselves from these wealthy diamond dealers that lived in the neighborhood where Mr. Fofana's parents lived, rather than on account of any protected ground. And there are numerous specific and cogent reasons that the immigration judge cited in connection with the adverse credibility finding. And you would argue we would not be compelled to find otherwise. That's correct, that there's a substantial evidence support. We get to the area that at least to me has some problems to it. And that is he gets captured, and then the guerrillas say, join us. And he says, I don't want to join you. And if that's all he said, then they beat him. And they go on, and they're doing this. There seems to be no beating for political beliefs or opinions or anything else under that scenario. But then he testifies, it seems to me, and I can't remember whether he said he told them, I don't believe, but I think he testified. He said, I told them I didn't believe in what they were doing, what they stood for, or anything, and I wouldn't join them. And so they beat him. Now, is that beating because of a political belief on his part? The testimony in the record and the evidence seems clear that they, the rebels, were not aware of any political belief. That they took him to the camp. Right, okay, we'll rock along with you on that. But then when they start beating him, what does the record say there? What does he tell them when they're beating him? They say, join us. He says, no, I won't. They say, well, why not? And then he apparently says, because I don't believe in the way the things you're doing, or something like that. It wasn't clear whether he told the rebels that, or whether that was his reason for not wanting to join them. Got you. But in any event, under the Supreme Court's decision on Elias Zacharias. Yeah, he was also a rebel, or got beat by the rebels. There would not be relief available. And here, the record is clear that after this incident took place, in January of 2000, for a few months, he was let go. He was then in Sierra Leone, in that location, and then later in Freetown, the capital, for a year. I thought the other group came in and liberated him, or he escaped or something. Yes, that is his testimony. But the fact remains, he was there all that time. Nothing happened, no harm in order to him. He's testified in the asylum application. He indicated that neither he nor any family member belonged to or was associated with any organization or group in Sierra Leone. And that conflicts with the testimony or the argument that his father was associated with the Sierra Leone People's Party. So we would never get, under your analysis of the case, to whether the government was unable or unwilling to control this activity. Because even if he suffered some harm, it was not because of his political position or whatever. But suppose we had to get to the question of whether the government was unable or unwilling. And how do you come out on that? To control this rebel band that kept beating him up? We would suggest that the evidence indicates that the government was able to control, in that they did come to that camp where he was being held. And he was released. And then he was in another refugee camp for a year after that. That wasn't the government, was it, that came to his aid? I thought it was another group of some sort. It was the group Ikangru, which I believe is an arm of the government. Also, in the record in the State Department report for 2001, it indicates that a United Nations security peacekeeping force is now in place. And that the human rights situation is improving. I've monopolized enough of your time. Thank you for my point. For the reasons indicated, we believe that the immigration judge's decision was well supported by the evidence in the record that the adverse credibility finding was correct. And even notwithstanding that adverse credibility finding, as the judge also found, there was no indication here that the harm that Mr. Fofana suffered was on account of a protected ground, rather than on the ground the immigration judge cited, which was because he was the son of wealthy diamond dealers. And the diamond dealers were targeted, apparently, because of their wealth. And the rebels tried to enrich themselves by robbing the houses of these individuals. Therefore, we would submit that the board's decision was correct and should be affirmed. Unless the court has any further questions, we would rely on our briefs. Thank you. Thank you. Mr. Nierheim will give you a minute of rebuttal. Thank you very much. The first thing I wanted to address was the issue of the deference standard. Our argument was not that this court is free to substitute its judgment for the judgment of the BIA or the immigration judge. But rather, that the immigration judge and the BIA failed to follow the Ninth Circuit law on making and evaluating credibility determinations. Secondly, there's some confusion. He did not say that he was let go. He testified in there. Pardon me, I can't hear you. What did you say? I said he did not testify that he was let go or released by the rebel forces. ECOMOG, which is not part of directly the government, ECOMOG apparently is an East African organization to try to protect themselves and advance economic interests, intervened. He was held in a refugee camp, or he stayed in a refugee camp for approximately a year. And then trouble started happening again in the area where he was held. And that's when he traveled through Guinea and then continued on to the United States. The other thing I wanted to state was that so far as the asylum application itself, the Ninth Circuit has recognized that often the asylum applications are prepared by people that are illiterate, don't speak English, and have a lot of problems in developing their case. If you look at the original of the asylum application, the copy of it that's in the record, starting about page 249, it was handwritten by someone who apparently was maybe perhaps illiterate or quasi-illiterate, I should say. And the specific action where he supposedly says that, where they're arguing that there was no limit, that he had no one in his family was a member of any organization, that's in a box that's just checkmarked on here. And then he goes on to say, when you read the rest of this, he says, I was arrested and forced to join the RUF. And apparently he meant they were trying to force him to join. I said no, I was told by the rebels that I would be killed. I told them I have nothing left to lose. That's what it says in here. And that's a different kind of rationale or theory, or it's a different factual pattern than what's been argued. And it's somehow that the only focus that he ever made was concerned about, you know, property or looting or something going on. And what we're trying to get at is that mixed motive analysis takes us down this road and that the looting as documented in the record was often in part to raise funds for the RUF, and it was a known practice. Thank you very much. We appreciate your argument, both counsel. The case of Cofana versus Gonzalez is submitted.
judges: Beezer, Thompson, McKeown